IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAVID MICHAEL BURKETTE,                        :
                                               :
          PLAINTIFF,                           :
                                               :
-VS-                                           :        CASE NO. 2:07-CV-1121-TFM
                                               :
MONTGOMERY COUNTY BOARD OF EDUCATION,          :
AND LEWIS E. WASHINGTON, JR.,                  :
                                               :
          DEFENDANTS.                          :

## MOTION FOR SUMMARY JUDGMENT

COMES NOW the Montgomery County Board of Education and Lewis E. Washington, Jr. Defendants in the above-styled cause, and pursuant to *Federal Rule of Civil Procedure* 56, moves this Court to grant summary judgment in favor of Defendants in that there is no genuine issue of material fact to be submitted to a jury and judgment should be entered in their favor as a matter of law as to all Plaintiff's claims.  In support of this motion, the Defendants rely upon the following:

1.     All pleadings filed in this matter.

2.     Exhibits 1 through 6, attached hereto and specifically.[1]

> Exhibit 1 -     Deposition of David Burkette
>
> Exhibit 2 -     Affidavit of Jimmy Barker
>
> Exhibit 3 -     June 20, 2006 Personnel Action Report
>
> Exhibit 4 -     September 26, 2006 Personnel Action Report-Coaching Supplements Roster for Lanier High School
>
> Exhibit 5 -     EEOC Charge and Affidavit

---

[1] Although specific page/line or paragraph cites are made to all factual statements made in the memorandum brief, the Board relies on the depositions, affidavits and documents referenced in their entirety and reserves the right to further cite to the exhibits relied upon, if necessary, when replying to any response Plaintiff might file to this motion.  The Board further reserves the right to cite to any portion of any deposition relied upon by Plaintiff.

Exhibit 6 -     Dismissal and Notice of Rights

3.     Memorandum Brief, submitted contemporaneously herewith.

WHEREFORE PREMISES CONSIDERED, the Defendants Montgomery County Board of Education and Lewis E. Washington, Jr. request summary judgment be granted in their favor and all Plaintiff's claims dismissed as a matter of law.

RESPECTFULLY SUBMITTED this the 18h day of July 2008.

MONTGOMERY COUNTY BOARD OF EDUCATION AND LEWIS E. WASHINGTON, JR., Defendants,

By:     /s/  Jayne H. Williams
        Elizabeth Brannen Carter (3272-C-38-E)
        Jayne L. Harrell (6544-Y-85H)
        Hill, Hill, Carter, Franco, Cole & Black, P.C.
        425 South Perry Street
        Montgomery, Alabama 36101-0116
        (334) 834-7600 - phone
        (334) 263-5969 - fax
        ECarter@HillHillCarter.com
        Jhwilliamsl@HillHillCarter.com
        Counsel for Defendants

## CERTIFICATE OF SERVICE

I Hereby Certify that I have this date served a true and correct copy of the foregoing *Motion for Summary Judgment* on Behalf of Defendants Montgomery County Board of Education and Lewis E. Washington, Jr. Upon David Burkette, Post Office Box 9257, Montgomery, Alabama 36108 by placing same in the United States Mail, postage prepaid and properly addressed this the 18th day of July, 2008.

        /S/ Jayne H. Williams
        OF COUNSEL

2

# Exhibit "1"

## Deposition of David Burkette

ORIGINAL

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5   DAVID MICHAEL BURKETTE,

6          Plaintiff,

                                    CIVIL ACTION NO.
7   Vs.                               2:07cv1121-TFM

8   MONTGOMERY COUNTY BOARD
    OF EDUCATION, and LEWIS E.
9   WASHINGTON, JR.,

10         Defendants.

11

12          * * * * * * * * * * *

13

14         **DEPOSITION OF DAVID M. BURKETTE**, taken pursuant

15  to stipulation and agreement before Pamela A. Wilbanks,

16  Certified Court Reporter, ACCR# 391, Registered

17  Professional Reporter and Commissioner for the State of

18  Alabama at Large, in the Law Offices of Hill, Hill,

19  Carter, Franco, Cole & Black, 425 South Perry Street,

20  Montgomery, Alabama, on Wednesday, July 9, 2008,

21  commencing at approximately 2:10 p.m.

22

23          * * * * * * * * * * * *

4

1    fine to ask me to rephrase it or repeat it so

2    you'll understand what I'm asking before you

3    answer.  If you need to take a break, let me

4    know and we'll do that.  Okay?

5  A.  Yes, ma'am.

6  Q.  Let me get your full name for the record.

7  A.  David Michael Burkette.

8  Q.  And how old are you, Mr. Burkette?

9  A.  I'm 51.

10  Q.  What's your date of birth?

11  A.  March 15, 1957.

12  Q.  And for the record you're a black male,

13     correct?

14  A.  Yes, ma'am.

15  Q.  Where were your born?

16  A.  Montgomery, Alabama.

17  Q.  And what's your address right now?

18  A.  2344 Clarence Lee Drive.

19  Q.  And how long have you been there?

20  A.  Fifteen months.

21  Q.  Are you married?

22  A.  Yes.

23  Q.  What's your wife's name?

7

1          sorry.

2     Q.   And you're certified to teach in the state of

3          Alabama?

4     A.   Yes.

5     Q.   What is your certification in?

6     A.   Certification is in health, physical education,

7          driver's education, administration.

8     Q.   What year were you hired by the Montgomery

9          County Board of Education?

10    A.   August 1990.

11    Q.   And are you still a teacher with the board?

12    A.   Yes, ma'am.

13    Q.   And what school are you at right now?

14    A.   Sidney Lanier High School.

15    Q.   And what year did you come to Lanier?

16    A.   In --

17    Q.   Was it '99?

18    A.   It was in May of 1999, yes.

19    Q.   Who was the principal when you got to Lanier?

20    A.   Farrell J. Duncombe was outgoing, and Lewis

21         Washington, Jr. was coming in.

22    Q.   Is he a black male?

23    A.   Yes.

8

1    Q.    Is your principal considered your immediate

2          supervisor?

3    A.    Yes.

4    Q.    And what subjects have you taught at Lanier?

5    A.    Lanier High School, I've taught physical

6          education, aerobics, health.  Served as an

7          assistant administrator -- administrative

8          assistant and driver's education currently.

9    Q.    How long have you been teaching driver's ed?

10   A.    Ever since I got certified in that.  I got

11         certified in that in 2000 or --

12   Q.    That's right.  2000.

13   A.    Okay.

14   Q.    I want to go or I want to try to go through each

15         school year since the '99-2000 school year.  And

16         what I want to know is who the principal was,

17         who the athletic director was, who the head

18         football coach was, and what your coaching

19         position was, if you had one.

20   A.    Yes, ma'am.

21   Q.    And I'll just ask you.

22   A.    Yes, ma'am.

23   Q.    And if you can't remember everything, that's

9

1      fine.  But we're going to do the best we can.

2   A.  Yes, ma'am.

3   Q.  Mr. Washington was principal in '99-2000?

4   A.  Lewis Washington, yes.

5   Q.  And who was the AD that year, if you remember?

6   A.  Robert Fuller.

7   Q.  And was he also head football coach?

8   A.  Yes.

9   Q.  What's his race and sex?

10  A.  Black male.

11  Q.  And did you coach that year?

12  A.  Yes.

13  Q.  What did you coach?

14  A.  Coached receivers on the football team.  Well,

15      football, basketball.

16  Q.  So would you be called an assistant football

17      coach that year?

18  A.  Yes.

19  Q.  And what about the basketball team?  What --

20  A.  I also was the head of junior varsity and

21      assistant basketball to the varsity.

22  Q.  So you were an assistant varsity basketball

23      coach and a junior varsity head coach?

1    A.    Yes, ma'am.

2    Q.    What about the next year, 2000-2001?

3          Mr. Washington was still the principal?

4    A.    He was still the principal.

5    Q.    And was Mr. Fuller still the AD?

6    A.    Yes.

7    Q.    And the head football coach?

8    A.    Yes, he was.

9    Q.    And what did you coach that year?

10   A.    Well, that particular year I only coached

11         basketball.

12   Q.    Was that the JV position or --

13   A.    Yes.  Junior varsity and -- Well, you're

14         automatically an assistant to the varsity.

15   Q.    What about '01-'02?  Was Mr. Washington still

16         the principal?

17   A.    Yes, he was.

18   Q.    And was Mr. Fuller still the AD and head

19         football coach?

20   A.    Yes, ma'am.

21   Q.    And did you continue to coach --

22   A.    Continued to coach basketball, yes, ma'am.

23   Q.    That's the JV head coach and assistant on the

1    varsity basketball team?

2  A.   Yes, ma'am.

3  Q.   What about '02-'03?  Mr. Washington was still

4       there?

5  A.   Still there.

6  Q.   And was Mr. Fuller still there?

7  A.   For '02-'03?

8  Q.   Yes.

9  A.   Yes, he was still there.  Mr. Fuller was still

10      there for '02-'03.

11  Q.   As AD and head football coach?

12  A.   Right.

13  Q.   Did you continue to coach the same positions?

14  A.   Yes.  Just basketball.

15  Q.   Were you doing any football coaching after

16      '99-2000?

17  A.   Yes, ma'am.  When the -- Coach Richard Moncrief,

18      I think he came in '03.

19  Q.   Okay.  I'm going to go right on to that year

20      then.

21           Was Mr. Washington still the principal in --

22  A.   Yes.  Mr. Washington was still the principal.

23  Q.   Let me finish so she can get it all down.

1          Okay?

2    A.    Yes, ma'am.

3    Q.    Mr. Richard Moncrief came in '03-'04 you think?

4    A.    Yes, ma'am.

5    Q.    And was he a black male?

6    A.    Yes, ma'am.

7    Q.    And what did you coach that year?

8    A.    That year I coached football and basketball.

9    Q.    Was Mr. Moncrief also the head football coach?

10   A.    Yes.  And athletic director.

11   Q.    In '04-'05 Mr. Washington was still there?

12   A.    Yes, ma'am.

13   Q.    And did Richard Moncrief continue as the

14         athletic director and head football coach?

15   A.    Yes, ma'am.

16   Q.    And what did you coach that year?

17   A.    Football, basketball.

18   Q.    What about '05-'06?  Who was the principal that

19         year?

20   A.    Mr. Lewis Washington.

21   Q.    And was Mr. Moncrief still there?

22   A.    Yes.

23   Q.    And did you continue with football and

13

1   basketball coaching?

2   A.   Yes, ma'am.

3   Q.   In '06-'07, was Mr. Washington still the

4        principal?

5   A.   Yes, ma'am.

6   Q.   Was Mr. Moncrief still the AD and head football

7        coach?

8   A.   No, ma'am.

9   Q.   Did you have a coaching position that year?

10  A.   No, ma'am.

11       This is '06-'07, right?

12  Q.   Yes.

13  A.   Yes, ma'am.

14  Q.   Did the athletic director have any say in what

15       coaches were hired for each position each year?

16  A.   Yes, ma'am.

17  Q.   Was it typical for an incoming AD to make

18       changes to their coaching staff?

19  A.   This was the first that I knew of of making

20       changes like that.

21  Q.   Were you there when Mr. Fuller started or did

22       you come in when he was already situated?

23  A.   I came and he was already there.

14

1    Q.    Did Mr. Moncrief or Coach Moncrief make changes

2          to the staff after Coach Fuller left?

3    A.    Yes, ma'am.

4    Q.    Because one of the changes was that you became a

5          football coach again?

6    A.    Right.

7    Q.    Since 1999 has any superintendent or the board

8          ever attempted to terminate you where you got a

9          termination letter where you were going to be

10         fired from your teaching position?

11    A.    No, ma'am.

12                   (Off-the-record discussion.)

13    Q.    Now I want to run through your litigation

14         history with the board.  And, again, we'll do

15         the best we can with the dates and that sort of

16         thing.

17    A.    Yes, ma'am.

18    Q.    Prior to the current EEOC charge and lawsuit

19         that we're here about today, my records show

20         that you filed three EEOC charges and three

21         lawsuits.  Does that sound close to correct?

22    A.    Yes, ma'am.

23    Q.    The first one I have was an EEOC charge, and I

15

1       did not have a filing date on that. But I think

2       it would have been '97-'98, somewhere in there.

3   A.   Yes, ma'am.

4   Q.   Do you know when you filed your first charge

5       with the board?

6   A.   I think it was in '97, I believe.

7   Q.   And what was the outcome of that charge?

8   A.   Outcome of that charge was -- resulted in my

9       transferring to Lanier. Was compensated for

10      back pay.

11  Q.   So it was settled?

12  A.   Yes, ma'am.

13  Q.   And then in 1998 I have that you filed a race

14      and retaliation lawsuit against the board, and

15      it was settled in June of 1999; does that sound

16      right?

17  A.   Yes, ma'am.

18  Q.   And then I have that you filed an EEOC charge in

19      November 2000, and that EEOC charge was settled

20      in April of 2001. Does that sound about right?

21  A.   Yes, ma'am.

22  Q.   And then I have an age and retaliation suit

23      filed in 2002, and summary judgment was granted

1      in the board's favor in October of 2003.

2   A.   That's correct.

3   Q.   And the last EEOC charge I have before this one

4        was an EEOC charge filed in December 2003 and

5        dismissed in August 2004, which means they

6        didn't make a finding on it.

7   A.   Right.

8   Q.   And then that was followed by a race and

9        retaliation suit in November 2004, and summary

10       judgment was granted in the board's favor in

11       October 2006.  Does all that sound about right?

12  A.   Yes, ma'am.

13  Q.   Outside of your discrimination suits with the

14       board, have you ever sued anybody else?

15  A.   The City Parks and Recreation back in 1992, I

16       believe.

17  Q.   And what was the result of that suit?

18  A.   Settled, and it was in my favor.

19  Q.   Have you ever been sued?

20  A.   No, ma'am.

21  Q.   Have you ever been arrested?

22  A.   No, ma'am.

23  Q.   Do you have any restraining orders or orders of

18

1    A.    No, ma'am.

2    Q.    In paragraph 8, if you'll look on page 3 for me,

3    you said that in July 2006, the Plaintiff

4    applied for a coaching position with the board

5    at Sidney Lanier.  Despite his experience and

6    winning record, he was told that there were no

7    more positions open because all positions had

8    been filled.

9         Is that right?

10    A.    Yes, ma'am.

11    Q.    Who told you there were no positions open?

12    A.    Lewis Washington and L. C. Cole.

13    Q.    Do you know about when that was in July '06?

14    A.    Yes, ma'am.  That was -- I'm not exactly

15    certain, but it was like July 9 through the --

16    Q.    Do you know --

17    A.    -- 11th or something.

18    Q.    I'm sorry.  July 9 through what?

19    A.    Through the 11th or something like that.

20    Q.    Somewhere in there?

21    A.    Yes, ma'am.

22    Q.    Do you know whether there were vacant coaching

23    positions at Lanier on that day that you were

20

1    A.    It wasn't exactly a certain which one made the

2         choice.  I went to the athletic director.  He

3         said it wasn't his doing.  And you go to the

4         principal, and he said it wasn't his doing.

5         So ...

6    Q.    Let me go back and ask you a question.

7            We talked about Richard Moncrief coming in

8         after Coach Fuller left.

9    A.    Yes, ma'am.

10    Q.    And Richard Moncrief made some changes to the

11         coaching staff?

12    A.    Yes, ma'am.

13    Q.    So would it be customary for an AD to be able to

14         make those sorts of decisions?  He can't hire

15         the person, but does he sort of decide who he

16         wants on his coaching staff?

17    A.    Yes, ma'am.  It's up to his discretion as to

18         what position that he want to keep each coach

19         at, you know, whether he want to change around

20         or something like that.  When he came in, this

21         is what he did.  He made some optional choices

22         on his behalf.

23    Q.    And just based on what you know about the

1     process, would it be fair to say that the AD

2     decides who he wants to hire as a coach or the

3     AD and the principal or some combination

4     thereof?

5  A.   It is a combination of both.  It's like one

6     request and the other one consent.

7  Q.   And then the principal sends that on up to the

8     superintendent who recommends it to the board?

9  A.   Yes, ma'am.

10  Q.   And the board actually does the hiring?

11  A.   Yes, ma'am.  The principal makes the

12     recommendation, yes, ma'am.

13  Q.   In paragraph 9 you said that in August or

14     September 2006, the Defendant hired a white male

15     at Sidney Lanier.

16  A.   Yes, ma'am.

17  Q.   I imagine to a coaching position?

18  A.   Yes, ma'am.

19  Q.   And who was hired for the position you're

20     talking about in that paragraph?

21  A.   Lester Henderson.

22  Q.   And he's a white male?

23  A.   Yes, ma'am.

23

1       position.  And he had asked Cole about the

2       baseball position, and Cole I think told him

3       that he would work with him, and if -- he was

4       just joining because he had to have a white, you

5       know, on the staff and that -- and if he was to

6       come out there, they'll negotiate something to

7       try to work something out.

8   Q.   So he was hired.  Coach Cole suggested him or

9       recommended him as an offensive line coach for

10      the football team.  He was not hired as the

11      baseball coach?

12   A.   No, ma'am.

13   Q.   Coach Cole told him that he needed to have a

14      white person on staff --

15   A.   Yes.

16   Q.   -- so to come on and coach football, and they'll

17      try to work something out about baseball?

18   A.   Exactly.

19   Q.   Tell me how you know all that.

20   A.   I talked with Lester myself, Henderson.  Yes,

21      ma'am.  Because I --

22   Q.   What happened with him?  He did not finish out

23      the year or the season?

24

1   A.   No.  I think he only stayed out there like maybe

2   two, three weeks at the most.

3   Q.   What do you know about how he came to leave the

4   position?

5   A.   How did he come -- He was visibly upset, and he

6   was talking about how L. C. led him on, you

7   know, to believing that he would get the

8   baseball job.

9   Q.   Who ended up with the baseball job?

10   A.   I don't know the coach's name, but it was

11   someone L. C. Cole had hired outside the school

12   system.

13   Q.   Was he black or white?

14   A.   He was black.

15   Q.   Were there any other white coaches at Lanier at

16   all that school year?

17   A.   No, ma'am.

18   Q.   And the offensive line coach for the football

19   team is a position that you had inquired about

20   or had applied for?

21   A.   Yes, ma'am.

22   Q.   Do you know if Mr. Washington was aware of Coach

23   Cole's preference for a white coach?

25

1  A.  Yes, ma'am.  As a matter of fact, it was
2     Mr. Washington's suggestion that Lester
3     Henderson go and talk with him because --
4  Q.  When you say "him," you mean Coach Cole?
5  A.  Yes, ma'am.  I'm sorry.
6  Q.  That's okay.
7  A.  Well, before that had happened, Washington
8     assumed that I was going to file a complaint
9     against that.  And therefore he told Steve
10    Holloway, who is currently the coach now -- told
11    Steve Holloway that he got to get a white -- Not
12    Holloway.  I'm sorry.  He told L. C. Cole that
13    he got to have a white in that position because
14    Burkette is going to go around and claim racial
15    discrimination.
16  Q.  Tell me how you knew that.
17  A.  Washington told Steve Holloway that.
18  Q.  Steve Holloway or L. C. Cole?
19  A.  He told Steve Holloway that he suggested to
20    L. C. Cole.
21  Q.  And did Steve Holloway come back and tell you?
22  A.  Yes, ma'am.
23  Q.  You go on in that same paragraph, paragraph 9,

27

1    Q.    When did Mr. Washington make that comment to

2          Richard Moncrief?

3    A.    When he was hired.

4    Q.    So that would have been running up on the

5          '03-'04?

6    A.    Yes, ma'am, something like that.

7    Q.    Who became offensive line coach after Lester --

           Did Lester Henderson quit?

8

9    A.    Yes, ma'am.

10   Q.    And who became the offensive line coach after

           that?

11

12   A.    It was a black male, but I'm not exactly sure.

13   Q.    Who was superintendent in the summer of '06?

           Was it Carlinda Purcell?

14

15   A.    Yes, ma'am.

16   Q.    And is she a black female?

17   A.    Yes, ma'am.

18   Q.    Do you know anything about her desires to have a

           white coach on staff?

19

20   A.    No, I don't know anything about her desire.

21   Q.    Do you know if she was aware of Mr. Washington

           making those sorts of comments?

22

23   A.    Yes, ma'am.

28

1   Q.   Tell me how she was aware.

2   A.   She was aware because I had filed a complaint

3        against Mr. Washington in reference to --

4   Q.   Did your complaint reference him wanting to have

5        a white coach on staff?

6   A.   I can't remember.

7   Q.   Was it a grievance?

8   A.   Yes, ma'am.  It was a grievance filed, and there

9        were several points that I made in that -- in

10       that grievance.  But I'm not sure ...

11  Q.   Did Dr. Purcell respond to the grievance at all

12       or did anybody respond to the grievance?

13  A.   No.  Dr. Purcell never respond to anything.

14  Q.   Did Mr. Barker respond to the grievance at all?

15  A.   Yes.

16  Q.   Tell me how he responded.

17  A.   Well, he responded by calling you into a

18       conference, you know, to discuss.  And once you

19       discuss everything, you never hear anything else

20       back, and that's the way he respond.

21  Q.   What about any of the board members?  Do you

22       know if they had any positions about there being

23       white coaches on staff at Lanier?

29

1    A.    None that I can recollect.  There was no

2          position taken that I know of.

3    Q.    Do you know if any of the board members were

4          aware that Mr. Washington was making these sorts

5          of comments about needing white coaches on

6          staff?

7    A.    I can't be certain of that.

8    Q.    And you're not sure if you ever reported those

9          sorts of comments to Dr. Purcell?

10   A.    No.  Not Dr. Purcell, but I did with Jimmy

11         Barker.

12   Q.    And how did you report the comments about

13         needing white coaches?  In what form did you do

14         that?

15   A.    I was -- I had told Mr. Barker -- I said,

16         Mr. Barker, listen.  I said, this is the 48th

17         time, you know, I've gotten turned down, you

18         know, different jobs.  I applied.  I applied.  I

19         applied.  And right now, you know, I was told by

20         L. C. that I would need a white -- that they

21         would need a white coach, you know.  But that

22         knocked me out.  I said, but when they came

23         back, they still hired two more black coaches:

30

1    Coach Cunningham -- Marvin Cunningham, and they

2    came back and hired another coach who Coach

3    Moncrief had run off.  And they also -- I mean,

4    this is a conversation I was telling Barker.

5    And I said, they also fired one of the coaches

6    who had a felony warrant against him for child

7    abuse, I said, and that position became

8    available and I requested that, and I was still

9    denied.

10   Q.    Did Mr. Barker have any response to you?

11   A.    Well, his response was, you know, he can't get

12   into that because that's a decision that has to

13   come from Lewis Washington or L. C. Cole, the

14   athletic director.  But they terminated that

15   particular coach.

16                (Defendant's Exhibit 2 marked for

17                    identification.)

18   Q.    I want to show what you I've marked as Exhibit

19   2, and that's a copy of your EEOC charge.

20   A.    Yes, ma'am.

21   Q.    And I think attached to that is Exhibit A to

22   your EEOC charge where you wrote about your

23   allegations to support your charge.

33

1   A.   I think that's when he was hired, I believe.

2   Q.   Okay.  It says:  During my basketball camp --

3   A.   Yes.

4   Q.   -- they announced "new coach".  L. C. Cole was

5        touring the gym facilities.

6   A.   Right.

7   Q.   Is that when -- Do you know whether or not

8        that's when the board hired him?

9   A.   Yes, ma'am.  That's when they made it official.

10  Q.   So when was Lester -- Was Lester Henderson then

11       the first offensive line coach hired by L. C.

12       Cole or by the board after L. C. Cole was hired

13       or was there somebody between --

14  A.   The terminated coach, the one that had the

15       criminal background, he was the one that was

16       hired.

17  Q.   L. C. Cole hired him first?

18  A.   Yes, ma'am.

19  Q.   For offensive line coach?

20  A.   Yes, ma'am.

21  Q.   Do you know his name?  That's okay.  If you

22       can't remember, that's okay.

23  A.   I can't think of it.

34

Q.   And then in August or September of 2006, according to your complaint, a white male was hired?

A.   Yes, ma'am.

Q.   And that was Lester Henderson?

A.   Yes, ma'am.

Q.   I just wanted to make sure I had the time line right on that.

A.   Yes, ma'am.

Q.   So in the EEOC charge -- did you talk about Lester Henderson getting hired in the EEOC charge?

A.   Other than on -- in the complaint -- What is this right here?  In the complaint I did, but I'm not ...

Q.   I see you talked about somebody being fired because of the criminal background.

A.   Yes, ma'am.

Q.   But did you ever go in and talk about that Lester Henderson was hired for that position?

A.   I did verbally, but I just don't see where I -- I left it off on here.

Q.   What do you mean verbally?

35

1   A.   To Jimmy Barker.

2   Q.   Did Mr. Washington ever tell you that you could

3        not be hired for offensive line coach because of

4        your lawsuits against the board?

5   A.   Yes, ma'am.  He said that I wouldn't be coaching

6        period because of the previous lawsuits, and he

7        informed L. C. Cole of the same.  He informed

8        committee members of the selection committee --

9        the hiring committee.  He informed several

10       members that it will be a waste of time if they

11       hire me because of my previous background or

12       reputation of suing the board.

13  Q.   I'm talking about what he told you.  What did he

14       tell you about you couldn't be hired for this

15       position or any coaching position because of

16       your lawsuits?  Did he tell you anything to your

17       face?

18  A.   Oh, yes.  Washington told me plenty of times.

19  Q.   Tell me about that.

20  A.   Washington told me -- He said, home boy, you're

21       just as good as gone; you can just -- I tried to

22       help you in the past; I tried to help you to get

23       into administration, but there's really no

36

1   future for you in coaching, Burkette -- I can

2   tell you that now -- because of your lawsuits.

3   Said, at some point, man, you've got to take the

4   lick and keep going, you know; you can't

5   continue to live off your lawsuits.

6   Q.   When was that conversation you had with him?

7   A.   That was one of several conversations we had.

8   That was in -- As a matter of fact, that was the

9   same day we had a convention with L. C. Cole,

10   Lewis Washington, Mary Markum (phonetic).

11   Q.   Summer of '06?

12   A.   Yes, ma'am.  No.  It was fall of '06.  It was in

13   September.

14   Q.   Did you put that conversation or any comments

15   like that in your EEOC charge, that

16   Mr. Washington told you that you could not be

17   hired for a coaching position because of your

18   litigation history?

19   A.   I talked about that so extensively, I'm not

20   sure.

21   Q.   And I'll tell you --

22   A.   I just can't remember.

23   Q.   -- what I saw was that you talked about

38

1    because you had filed prior lawsuits against the

2    board.

3         Tell me how you learned about the AD

4    position becoming vacant.

5    A.   The athletic director's position?  The athletic

6    director position became vacant.  That was

7    posted on the board, and they announced the

8    retirement of Robert Fuller from athletics.

9    Q.   Now --

10   A.   I mean the resignation.  I'm sorry.

11   Q.   Of Robert Fuller or Richard Moncrief?  This is

12   June of '06.

13   A.   This is June of '06.  Okay.  Richard Moncrief

14   had received a non-renewal letter from the

15   board.

16   Q.   And they posted his position?

17   A.   Yes, ma'am.

18   Q.   And how did you apply?  Did you file a letter of

19   interest?

20   A.   Yes, ma'am.  Being an employee of the board

21   already, you're just required to file a letter

22   of interest.

23   Q.   Is it accurate there was also a head football

39

1      position available?

2  A.   Yes, ma'am.

3  Q.   Did you apply for that as well?

4  A.   Yes, ma'am.

5  Q.   And do you have a letter that says that you are

6      applying for both the head football position and

7      the AD position?

8  A.   Yes, ma'am.

9  Q.   I thought you were not applying for both.

10 A.   When I got in, it was -- On paper I had applied

11     for both positions.  But when we got in,

12     Mr. Barker said, you're just applying for

13     athletic director or do you want to be

14     interviewing for the football?  And I said,

15     well, the athletic director.

16 Q.   So on paper you said you wanted to apply for

17     both?

18 A.   On paper I applied for both.

19 Q.   But you later chose to only go for the AD

20     position?

21 A.   Yes, ma'am.

22 Q.   Why is that?

23 A.   Well, the athletic director position is just --

40

1       I was in school for one thing, and I felt like I

2       would have had more time.

3   Q.   Is it fair to say that the board usually hires

4       the same person as the AD and the head football

5       coach?

6   A.   Yes, ma'am.  But it is two separate positions.

7   Q.   Right.

8   A.   And using George Washington Carver as an

9       example, Michelle Simmons is athletic director

10      there.  Brewbaker Technical High School also --

11      Technology High School also had a female

12      athletic director as in LAMP over at Loveless.

13      They had a female athletic director.

14  Q.   Can you think of a time when the head football

15      coach was not the AD at Lanier?

16  A.   Yes, ma'am.

17  Q.   Tell me when that was or who that was.

18  A.   Robert Fuller did not become athletic director

19      until John Bricken had stepped down.  John

20      Bricken was the head of the basketball.

21  Q.   How long ago would that have been?

22  A.   That was in the middle '90s.

23  Q.   Do you know how many applicants were interviewed

41

1      for the AD position?

2   A.  No, ma'am.  Not exact number.

3   Q.  Did you get an interview?

4   A.  Yes, ma'am.

5   Q.  Who was on the screening committee?

6   A.  What year?

7   Q.  This is the summer of '06.

8   A.  Summer of '06?  Shelby Meadows.

9   Q.  Is that a man or woman?

10  A.  It's a man.  I'm sorry.

11  Q.  And who is he?

12  A.  He at the time I think was the booster club

13      president.

14  Q.  For Lanier?

15  A.  Yes, ma'am.

16          Robert Wagstaff.

17  Q.  Who is he?

18  A.  He was the PTSA president of Lanier High School.

19  Q.  Okay.  Who else?  Was Mr. Washington on the

20      committee?

21  A.  Yes.  Washington -- Lewis Washington was on the

22      committee.

23  Q.  Was Mr. Barker on the committee?  Let's try it

46

1    season of '06.

2  Q.   And you've already told me that Mr. Washington

3       told you directly that you were not going to get

4       a coaching position because of your lawsuits.

5  A.   Yes, ma'am.  And he also told the security guard

6       who also -- he left -- I think he left late June

7       of '06.  He had inquired -- just said -- He was

8       teasing Washington and just say, well, y'all got

9       the best athletic director already here; you got

10      Burkette.  He said, man, let me tell you

11      something; Burkette couldn't get hired here even

12      if they wanted to hire him because of those

13      lawsuits he got, man.  Said, nobody going to put

14      up with him.  That's the comment made to Bronson

15      McCoy.

16  Q.   And who ended up receiving the position?

17  A.   L. C. Cole.

18  Q.   And what's his race and sex?

19  A.   Black male.

20  Q.   Do you know much about his coaching background?

21  A.   L. C. Cole?

22  Q.   Yes.

23  A.   Yes, ma'am.  The only thing that I really knew

47

1      of him was that he was a college coach at

2      Alabama State University, and previously he was

3      at Tennessee State University is all I know.

4  Q.  Was he good?

5  A.  No.  No.  Even at Lanier he still finished with

6      a 9-and-14 record.

7  Q.  Is it your position that he was unqualified for

8      the AD and head football coach position at

9      Lanier?

10  A.  Yes, ma'am.  He wasn't certified for that

11      position, and there was a lot of lying really

12      just went down in there saying that he was in

13      school -- class.  There's no record of him being

14      in school or anything, in class.  As a matter of

15      fact, he had told me that he didn't have time,

16      you know, to go back to school.

17  Q.  Let me ask the same question about

18      Mr. Henderson.  Was he unqualified for the

19      offensive line football coach position?

20  A.  No, ma'am.  He was qualified.

21  Q.  You go on in paragraph 10 to say that when one

22      of the members of that committee informed

23      Mr. Washington that she would not participate if

48

1      she could not recommended the most qualified

2      person, who was the Plaintiff, Mr. Washington

3      told her that she was no longer needed on the

4      committee and that he would replace her with

5      someone else, which he did.

6   A.   Right.  And shortly afterward she was

7        transferred out of there.

8   Q.   And who are you talking about?

9   A.   Sheila Tillis.

10  Q.   Did you hear Mr. Washington make that statement,

11       that he would replace her if she wouldn't do

12       what he said?

13  A.   No, ma'am, I didn't hear.  But he told her --

14       according to her, this is what he told her.

15  Q.   And she told you?

16  A.   Yes, ma'am.

17  Q.   Was her comment that she wanted to recommend you

18       or that she wanted to recommend the most

19       qualified person, whoever she thought it was?

20  A.   Her comment to me was she clearly had told him

21       she was going to recommend me.

22  Q.   And who was she replaced by?

23  A.   No one.  This led to me being the only driver's

49

1   ed instructor at the school, which Washington

2   told me that he was going to run me off.

3   Q.   Are you talking about the teaching position she

4   held or her position on the committee?  Did he

5   replace her on the committee?

6   A.   Oh, yes, ma'am.  He replaced her on the

7   committee, but I'm not certain who he replaced

8   her with because I didn't know who all was on

9   the committee until I actually had gone for the

10   interview.

11   Q.   So after you interviewed, she said she wanted to

12   vote for you.  And he said he's going to take

13   her off the committee?

14   A.   Yes, ma'am.

15   Q.   And he did replace her with somebody, but you

16   don't know who?

17   A.   I don't know who it was.

18   Q.   Did you report that comment to anybody with the

19   board?

20   A.   Yes.

21   Q.   Who?

22   A.   Jimmy Barker.

23   Q.   Was Ms. Purcell still superintendent at this

52

1   A.   Yes, ma'am.

2   Q.   -- and give her a background on them.

3   A.   That's pretty much what it was.

4   Q.   Do you know if she or any board members told

5       anybody that you could not have the AD position

6       because of your past lawsuits or any position

7       because of your past lawsuits?

8   A.   I'm not certain.  The only thing I rely on is

9       I continued to apply and continued to get

10      denied.

11   Q.   Do you know if she or any board members told

12      anybody that you couldn't have the position for

13      any reason?

14   A.   No, ma'am.

15   Q.   Past lawsuits, your race, they don't like the

16      way you wear your coat or anything?

17   A.   I can't be certain.

18   Q.   Did you ever talk to her or any board members

19      about the AD position or the position that was

20      filled by Lester Henderson?

21   A.   Well, during that particular time, I think she

22      had gotten a suspension -- leave.  She was going

23      through the turmoil she was going through during

58

1    since 2002.

2    Q.    What are you talking about a record?

3    A.    A record of positions that I applied for,

4          athletic positions.  Is that what you're talking

5          about?

6    Q.    I'm talking about the positions that we talked

7          about earlier:  The assistant football coach,

8          the JV head coach.  You got all those positions

9          from '99-2000 to '04-'05 even though you had

10         been filing lawsuits against the board.

11   A.    Yes, ma'am.  Yes, ma'am.  Sorry.

12   Q.    And do you know whether or not -- Do you know

13         now whether or not Mr. Washington was always

14         passing your name up to the superintendent?

15   A.    I know now that Mr. Washington and Mr. Jimmy

16         Barker were really in a scheme together to keep

17         me from getting another position regardless of

18         what my qualifications were.

19   Q.    But you did have positions every year up

20         until --

21   A.    Up until --

22   Q.    -- including '05-'06?

23   A.    Yes, ma'am.  Up until the '06-'07 school term

59

1    when they had L. C. Cole -- when they was

2    bringing him in.

3    Q.    So your name got sent out every year by

4    Mr. Washington from '99-2000 up through '05-'06?

5    A.    Yes, ma'am.

6    Q.    But the '06-'07 you did not get a position?

7    A.    No, ma'am.

8    Q.    Did the superintendent pass all of those

9    recommendations up to the board --

10   A.    Yes, ma'am.

11   Q.    -- to your knowledge?

12   A.    Yes, ma'am, to my knowledge.

13   Q.    And did the board always approve your contracts

14   from '99-2000 to '05-'06?

15   A.    Yes, ma'am.

16   Q.    But you didn't know that was happening.  Is that

17   what you're saying?

18   A.    No, ma'am, I didn't.  It was a concept where he

19   had got from Lowndes County, Dr. Covington.  He

20   decided he was going to implement it in

21   Montgomery County.

22   Q.    Who are you talking about?

23   A.    Lewis Washington.  About the termination of

# Exhibit "2"

## Affidavit of Jimmy Barker

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAVID MICHAEL BURKETTE,                          :
                                                 :
    PLAINTIFF,                                   :
                                                 :
-VS-                                             :        CASE NO. 2:07-CV-1121-TFM
                                                 :
MONTGOMERY COUNTY BOARD                          :
OF EDUCATION AND LEWIS E.                        :
WASHINGTON, JR.,                                 :
                                                 :
    DEFENDANTS.                                  :

### AFFIDAVIT OF JIMMY BARKER

Before me, the undersigned authority, in and for said county and state, personally appeared Jimmy Barker, who being known to me and being first duly sworn, deposes and says under oath as follows:

1.    My name is Jimmy Barker.  I am a black male over the age of nineteen and I have personal knowledge of the matters set forth herein.

2.    I have been the Assistant Superintendent of Human Resources for the Montgomery County Board of Education since July 1998.

3.    Superintendent Carlinda Purcell, a black female, was Superintendent of the Board from December 2004 until August 2006.  Linda Robinson, a black female, was interim Superintendent from September 2006 until March 2007. Lewis Washington, a black male, was Principal of Lanier High School from the 1999/2000 school year until the end of the 2006/2007 school year.

4.    I know David Burkette and am familiar with the claims he has made in the above-styled lawsuit.

5.    I work with principals of the various schools in the placement of personnel.

6.    Coaching positions are supplementary (non-teaching) positions. Following the recommendation of a candidate for a coaching position by the principal, the Superintendent recommends the candidate to the Board for final approval.

7.    Traditionally, but with limited exceptions, the Athletic Director and Head Football Coach of a school are the same person.

8.    There were four applicants for the Athletic Director and Head Football Coach positions at Lanier in 2006:  L.C. Cole, David Burkette, Steve Holloway and Floyd Mathews, all of whom are black males.

9.    A selection committee was formed to consider the applicants for the Lanier's Athletic Director and Head Football Coach positions.

10.    The selection committee members were Principal Lewis Washington, Booster Club President Shelby Meadows, PTSA President Robert Wagstaff, Booster Club Member Rob Freeman and Assistant Principal Jerone Torbert.

11.    I observed the selection committee interview and discuss the candidates to ensure that proper procedure was followed, but I did not vote.

12.    L.C. Cole, a former head football coach at the college level, had extensive football coaching experience and demonstrated success as a head football coach.  He also scored better than any other candidate on the

interview questions developed by the committee. Also, Cole applied for both the Athletic Director and Head Football Coach positions. Following the interviews of the candidates, the selection committee determined that L.C. Cole was the most qualified applicant and that it would recommend L.C. Cole as its top choice for both the Athletic Director position and the Head Football Coach position. Burkette's litigation history was never raised before the selection committee by anyone.

13.    Dr. Purcell accepted the committee's recommendation and recommended L.C. Cole to the Board. The Board approved L.C. Cole as Lanier's Athletic Director and Head Football Coach at its meeting on June 20, 2006.

14.    Following his hire, Coach Cole, who already held a degree in Physical Education, legally taught under an emergency teaching certificate from the Alabama State Department of Education until he received a regular teaching certificate in 2007.

15.    Each high school is allotted three assistant football coaching positions.

16.    The Head Football Coach has the discretion to assign his assistants as he sees fit within certain constraints. For instance, all assistant coaches must be certificated teachers for the Board.

17.    James Cox, a black male, was initially extended an offer of employment for a teaching position at Lanier on July 10, 2006. At that time, he was also identified as one of the assistant football coaches for the upcoming year. However, because of issues with his background check, his offer of

employment was rescinded on August 25, 2006 and he was never approved as an assistant football coach by the Board.

18.   During the 2006/2007 school year, Lanier had a total of four assistant football coaches approved by the Board at its September 26, 2006 meeting: Floyd Mathews, Anthony Adams, Steve Holloway and Craig Payne, all black males and all of whom were experienced football coaches for the Board.  Because Floyd Mathews is in a grandfathered position, he was not counted against Lanier's allotment of three assistant football coaching supplements.

19.   Lester Henderson was never submitted to the Superintendent or Board for nor did he receive a football coaching supplement during the 2006/2007 school year.

20.   I have never made a personnel decision regarding Mr. Burkette based on his race or his prior complaints against the Board.

21.   Neither Coach Cole, Mr. Washington, Dr. Purcell, Mrs. Robinson nor any member of the Board told me that Mr. Burkette could not be hired because of his race or prior complaints against the Board.

Further affiant saith not.

_____
JIMMY BARKER

4

STATE OF ALABAMA            )
COUNTY OF MONTGOMERY    )

    Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared **JIMMY BARKER**, who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

NOTARY PUBLIC

My Commission Expires: _1/3/10_

(SEAL)

5

# Exhibit "3"

## June 20, 2006
## Personnel Action Report

**MONTGOMERY PUBLIC SCHOOLS**
**City and County**
**Montgomery, Alabama**

**SUPERINTENDENT'S OFFICE**                                    **JUNE 20, 2006**

Board of Education
Montgomery County

Dear Board Members:

I hereby nominate the following persons for the positions listed below and report
other changes as noted:

## CERTIFIED PERSONNEL

## ADMINISTRATION BUILDING

**CENTRAL OFFICE**

1. **Hosea Addison**, teacher assigned to Central Office for reassignment, be
   transferred to teacher at Goodwyn Junior High School, effective
   August 9, 2006, board approved 187-day salary schedule, replacing **Vivian
   Jones**, transferred earlier.

2. **Ronald Ashley**, teacher assigned to Central Office for reassignment, be
   transferred to teacher at Bellingrath Junior High School, effective
   August 9, 2006, board approved 187-day salary schedule, replacing **Maurice
   Buchanna**, contract non-renewed earlier.

3. **Karen Davis**, teacher assigned to Central Office for reassignment, be
   transferred to teacher at Bellingrath Junior High School, effective
   August 9, 2006, board approved 187-day salary schedule, replacing **John
   Thompson**, contract non-renewed earlier.

4. **Edward Hodge**, teacher assigned to Central Office for reassignment, be
   transferred to teacher at Fitzpatrick Elementary School, effective
   August 9, 2006, board approved 187-day salary schedule, replacing **Lashonda
   Haigler**, transferred earlier.

5. **Anna Lingo**, teacher assigned to Central Office of reassignment, be transferred
   to teacher at Floyd Elementary School, effective August 9, 2006, board
   approved 187-day salary schedule, replacing **Latonia Whetstone**, transferred
   earlier.

**SUPERINTENDENT'S OFFICE**                    **-2-**                    **JUNE 20, 2006**

**CENTRAL OFFICE**

6. **Kenyetta Miller**, contract principal assigned to Central Office for reassignment, be transferred to principal at Morningview Elementary School, effective July 1, 2006, at annual salary of $60,834.48;  12-month work term, replacing **Jerry Hooks**, contract non-renewed earlier.

7. **Valeria Ann Perkins**, teacher assigned to Central Office for reassignment, be transferred to teacher at McIntyre Middle School, effective August 9, 2006, at an annual salary of $41,340.00;  board approved 187-day salary schedule, replacing **Angela Nixon**, contract non-renewed earlier.

8. **Shelby Powell**, teacher assigned to Central Office for reassignment, be transferred to teacher at Carver Senior High School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Kimberly Altizer**, resigned earlier.

9. **Michelle Tharpe**, teacher, be resigned, effective August 9, 2006.

10. **Bennie Webb**, teacher assigned to Central Office for reassignment, be transferred to teacher at Lanier Senior High School, effective August 9, 2006, board approved 187-day salary schedule, program needs.

11. **Pamela Wilborn**, teacher assigned to Central Office for reassignment, be transferred to teacher at McKee Elementary School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Lindsay Cox**, teacher, McKee Elementary School, be resigned, effective May 24, 2006.

**OFFICE OF INSTRUCTIONAL SUPPORT SERVICES**

12. **Kathy Hardy**, coordinator, EvenStart at Daisy Lawrence Educational Training Center, be transferred to parent coordinator, HIPPY at Daisy Lawrence Educational Training Center, effective August 9, 2006, board approved 187-day salary schedule, replacing **Elizabeth Fryer**, parent coordinator, HIPPY at Daisy Lawrence Educational Training Center, be transferred to teacher at Capitol Heights Junior High School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Mary S. Mayes**, retired earlier.

**OFFICE OF TEACHING & LEARNING**

13. **Donald Carter**, teacher assigned to Central Office for reassignment, Career Tech, be transferred to teacher at Capitol Heights Junior High School, effective July 24, 2006, at an annual salary of $43,958.75;  202-day work term, replacing **Christopher Washington**, non-renewed earlier.

**SUPERINTENDENT'S OFFICE**        **-3-**        **JUNE 20, 2006**

## OFFICE OF TEACHING & LEARNING

14. **Donna M. Nelson**, curriculum specialist, Title I Services, be transferred to teacher at Baldwin Arts & Academics Magnet School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Wendy Hamil**, non-renewed earlier.

15. **Cynthia L. Short**, director, Special Education, be resigned, effective June 30, 2006.

## BELLINGRATH JUNIOR HIGH SCHOOL

16. **Angela Mangum**, probationary contract principal, be resigned, effective July 5, 2006.

## BREWBAKER TECHNOLOGY MAGNET HIGH SCHOOL

17. **Aliki Pauline Goler**, teacher, be transferred to teacher/activities director at Jefferson Davis Senior High School, effective July 24, 2006, at an annual salary of $39,898.80; 202-day work term, replacing **Gena Jacobs**, transferred earlier.

## CARVER SENIOR HIGH SCHOOL

18. **Barbara Demus**, teacher, be transferred to teacher at Jefferson Davis Senior High School, effective July 24, 2006, annual salary and work term to remain the same, replacing **Connie Crowe**, retired earlier.

19. **Sandra Moon-Williams**, teacher, Carver Senior High School, be transferred to teacher at Chisholm Elementary School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Frank Besteder**, see item # 20.

## CHISHOLM ELEMENTARY SCHOOL

20. **Frank Besteder**, teacher, be transferred to teacher at Carver Senior High School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Sandra Moon-Williams**, see item # 19.

## DAVIS LEARNING CENTER

21. **Joann Hall**, teacher, be transferred to teacher at Brewbaker Primary School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Kimberly Richey**, resigned earlier.

SUPERINTENDENT'S OFFICE                    -4-                    JUNE 20, 2006

DAVIS LEARNING CENTER

22. **Priscilla Russell**, teacher, be transferred to teacher at Brewbaker Primary School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Crystal Pendleton**, contract non-renewed earlier.

FLOYD MIDDLE SCHOOL FOR MATHEMATICS, SCIENC, & TECHNOLOGY

23. **Patsy P. Jeffcoat**, media specialist, be transferred to media specialist at Lee Senior High School, effective July 24, 2006, at an annual salary of $52,886.76; 202-day work term, replacing **Laura Guilford**, retired earlier.

24. **Latonya Whetstone**, teacher, be transferred to teacher at Lee Senior High School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Jennifer Bailey**, transferred earlier.

GOODWYN JUNIOR HIGH SCHOOL

25. **Vivian Stevens Jones**, teacher, be transferred to teacher at Jefferson Davis Senior High School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Gloria Hollis**, retired earlier.

26. **Felix Tyre**, teacher on administrative leave of absence, leave be terminated, effective May 24, 2006; then , be transferred to teacher at Bellingrath Junior High School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Leonard Jones**, contract non-renewed earlier.

HALYCON ELEMENTARY SCHOOL

27. **Megan Dean Weimer**, teacher, be transferred to teacher at Blount Elementary School, effective August 9, 2006, board approved 187-day salary schedule, program needs.

HAYNEVILLE ROAD ELEMENTARY SCHOOL

28. **Ronald Grace**, principal on illness leave of absence, leave be terminated, effective June 15, 2006.

HOUSTON HILL JUNIOR HIGH SCHOOL

29. **Martin Dunstan Stage**, teacher, be transferred to teacher at Morris Elementary School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Lisa Carroll**, transferred earlier.

SUPERINTENDENT'S OFFICE                    -5-                    JUNE 20, 2006

## JEFFERSON DAVIS SENIOR HIGH SCHOOL

30. **Nancy Harris**, teacher, be transferred to teacher at Fews Secondary Alternative School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Susan Godwin**, non-renewed earlier.

## JOHNSON ELEMENTARY SCHOOL

31. **Jacqueline D. Campbell**, probationary contract principal, be granted illness leave of absence, effective July 11, 2006, ending date to be determined.

## KING ELEMENTARY SCHOOL

32. **Aleysia Abernathy Alves**, reading coach, be transferred to assistant principal at McKee Elementary School, board approved 187-day salary schedule, plus an annual supplement of $3,128.76;  replacing **Pat Johnson**, retired earlier.

## LANIER SENIOR HIGH SCHOOL

33. **Lawrence Darnell Cole**, B.S., University of Nebraska, be employed as teacher/athletic director/head football coach, effective July 24, 2006, at an annual salary of $43,195.20, plus an annual supplement of $11,088.36;  202-day work term, replacing **Richard Moncrief**, contract non-renewed earlier.

34. **Shelia Tillis**, teacher, be transferred to teacher at Brewbaker Technology Magnet High School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Harold House**, retired earlier.

## LEE SENIOR HIGH SCHOOL

35. **Antoine R. Richardson**, teacher, be transferred to teacher at Goodwyn Junior High School, effective August 9, 2006, board approved 187-day salary schedule, replacing **Rachael Pouncey**, non-renewed earlier.

## LOVELESS ACADEMIC MAGNET PROGRAM

36. **Veverly Arrington**, principal, be transferred to educational specialist in the Office of Human Resources, effective July 1, 2006, at an annual salary of $67,063.92; work term to remain the same, replacing **Carolyn Hicks**, retired earlier.

**SUPERINTENDENT'S OFFICE**                    -6-                    **JUNE 20, 2006**

**NIXON ELEMENTARY SCHOOL**

37. **Regina Thompson**, probationary contract principal, be granted illness leave of absence, effective May 22, 2006, through July 7, 2006.

**SOUTHLAWN MIDDLE SCHOOL**

38. **Charmaine Powell**, teacher, be transferred to teacher at Jefferson Davis Senior High School, effective August 9, 2006, board approved 187-day salary schedule, Title I Fund; replacing **Portia Redd**, teacher, Jefferson Davis Senior High School, be transferred from Title I Fund to General Fund, effective August 9, 2006.

Sincerely,

Carlinda Purcell, Ed.D
Superintendent

/fmp

# Exhibit "4"

## September 26, 2006 Personnel Action Report- Coaching Supplements Roster for Lanier High School

**SUPERINTENDENT'S OFFICE**                     **-28-**                     **SEPTEMBER 26, 2006**

### COACHING/CHEERLEADING SUPPLEMENTS

   The following board *employees* are hereby recommended to receive salary supplements for the 2006-2007 school year for performance of duties associated with the activities as described.  The supplement is applicable for the current school year only and will not be paid in the event that the named employees are unable for whatever reason to honor their commitment.

Linda Robinson
Interim Superintendent

/fmp

**SUPERINTENDENT'S OFFICE** -35- **SEPTEMBER 26, 2006**

## LANIER SENIOR HIGH SCHOOL

**Lewis Washington - Principal**
**2006-2007 School Year**

| NAME | SUPPLEMENT | PRICE |
|------|-----------|-------|
| Anthony Adams | Assistant Football<br>Golf | $ 3,881.04<br>776.40<br>**$ 4,657.44** |
| Lawrence Cole | Athletics Director<br>Head Football | $ 2,587.56<br>9,055.24<br>**$11,642.80** |
| Jonathan Colvin<br>(based @ Nixon Elementary) | Head Baseball<br>Girls Tennis | $ 2,587.56<br>776.40<br>**$ 3,363.96** |
| Marvin Cunningham | Assistant Baseball<br>Assistant Girls Track | $    776.40<br>776.40<br>**$ 1,552.80** |
| Shirley Dolman<br>(based @ Goodwyn Jr. High) | Softball | **$ 2,587.56** |
| Edwin Hampton | Head Girls Track | **$ 2,587.56** |
| Nikisha Hayes<br>(based @ Houston Hills Jr. High) | Assistant Girls Basketball | **$ 1,293.96** |
| James Henderson | Wrestling | **$ 2,587.56** |

**SUPERINTENDENT'S OFFICE**         -36-         **SEPTEMBER 26, 2006**

## LANIER SENIOR HIGH SCHOOL
### (Continued)

| NAME | SUPPLEMENT | PRICE |
|------|-----------|-------|
| Antoine Hill<br>(based @ McIntyre Middle) | Head Track | $2,587.56<br>776.40<br>**$3,363.96** |
| Steve Holloway | Assistant Football<br>Head Girls Basketball | $3,881.04<br>3,881.04<br>**$7,762.08** |
| Kenneth Keith | Assistant Boys Basketball | **$1,293.96** |
| Floyd Mathews | Head Boys Basketball<br>Assistant Football | $3,881.04<br>3,881.04<br>**$7,762.08** |
| Craig Payne | Assistant Football<br>Tennis | $3,881.04<br>776.40<br>**$4,657.44** |
| Johnnie M. Tobert | Volleyball<br>Volleyball - Summer | $1,940.76<br>1,293.96<br>**$3,234.72** |

# Exhibit "5"

## EEOC Charge and Affidavit

# CHARGE OF DISCRIMINATION

AGENCY    CHARGE NUMBER

___ FEPA
xx EEOC    420 - 2007 - 01352

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

and EEOC

| | |
|---|---|
| State or local Agency, if any | HOME TELEPHONE (Include Area Code) (334) 288-7827 |

| (Indicate Mr., Ms., Mrs.) | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 3 Burkette | Montgomery, AL 36116 | 3-15-57 |
| ET ADDRESS | | |
| Cross Creek Drive | | |

IED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE |
|---|---|---|
| E | | (334) 223-6700 |
| Area Code) | 500+ | COUNTY |
| tgomery County Board of Education | CITY, STATE AND ZIP CODE | Montgomery |
| ET ADDRESS | Montgomery, AL 36102 | TELEPHONE |
| South Decatur Street | NUMBER OF EMPLOYEES, MEMBERS | |
| E | | |
| : Area Code) | | COUNTY |
| | CITY, STATE AND ZIP CODE | |
| ET ADDRESS | | |

DATE DISCRIMINATION TOOK PLACE
EARLIEST                          LATEST

SE OF DISCRIMINATION BASED ON (Check appropriate box(es))

___ RACE  ___ COLOR  ___ SEX  ___ RELIGION  ___ NATIONAL ORIGIN
X RETALIATION  ___ AGE  ___ DISABILITY  ___ OTHER (Specify) Harassment
X  Equal Pay Act

X  CONTINUING ACTION

PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I.    See Attached Exhibit "A" which I incorporate herein with this filing as if specifically set out in this section.

II.

RECEIVED
EEOC

JAN - 5 2007

III.    BIRMINGHAM DISTRICT OFFICE

UNSWORN DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the foregoing STATEMENT and that it is true and correct to the best of my knowledge, information and elief.

AFFIDAVIT OF DAVID BURKETTE    RECEIVED
EEOC

JAN - 5 2007

BIRMINGHAM DISTRICT OFFICE

STATE OF ALABAMA          )
MONTGOMERY COUNTY     )

Before me, the undersigned Notary Public in and for the State of Alabama at large, personally appeared David Burkette who, after being duly sworn under oath, deposes and states as follows:

My name is David Burkette and I have personal knowledge of the facts contained in this affidavit. I am an employee with the Montgomery County Board of Education. I have filed multiple EEOC complaints and EEOC lawsuits against the Montgomery County Board of Education due to their continued retaliatory and discriminatory actions against me. The EEOC complaints and EEOC lawsuits have opposed the unlawful discriminatory practices of the Montgomery County Board of Education and have alleged racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 as amended by the 1991 amendment thereto. My current duties with the Montgomery County Board of Education involve me working as a Drivers Ed Instructor.

Prior to the 2006-2007 school year I had supplemental duties and income as the Assistant Varsity Basketball Coach and Junior Varsity Head Basketball Coach. I have been subjected in the past and continue to be subjected to retaliation for opposing the unlawful employment practices of the Montgomery County Board of Education, filing EEOC complaints and Title VII lawsuits. This retaliation involves removal of all coaching duties and constant harassment of me and my family by the Montgomery County Board of Education and Lewis Washington, principal of Sidney Lanier High School here in Montgomery. My immediate supervisor is Lewis Washington. As a coach, my immediate supervisors were the athletic director and Lewis Washington. Lewis Washington has expressed to various individuals that he would not hire me for positions because I have previously filed EEOC lawsuits and EEOC complaints.

On May 15, 16 and 18, 2006, while Coach Moncrief was still Athletic Director of Sidney

EXHIBIT
"A"

Lanier, Principal Washington and L.C. Cole had a closed door meeting in Washington's office. Additionally, Principal Washington and L.C. Cole toured Lanier's facilities on May 15, 2006.

On May 22, 2006, Washington conducted a meeting that I requested regarding the recently vacant Athletic Director's and head football coach positions for the 2006-2007 school term. The purpose of the meeting was to express an interest in the Athletic Director's position. Lewis Washington told me that "well . . . I think that you might want to leave that alone." I asked why and he stated, "whomever gets the head football position will automatically get the A.D. job." I stated those were two separate positions and that I had over 20 years of coaching experience, including two years of serving as athletic director. So, I would indeed apply for it. His final statement was "you can apply, but Mr. Barker said that one person would get both positions; but, you can still apply."

On May 23, 2006, I asked Washington if there was anything that I could do in supporting Coach Moncrief's effort to remain in the athletic arena at Lanier. Suggestions included teaching all driver's ed, administration and even transferring to another school in order for this man to have a job. Washington stated "Moncrief don't have nobody to blame but Moncrief; ain't nothing you and I can do."

On May 24, 2006, Washington held a meeting with all coaches and handed each of us a non-renewal letter.

On May 25, 2006, Washington escorted a coaching candidate through Lanier's facilities. Washington stopped by my room (211) and introduced him to me. Principal Washington stated, "This is one of our coaches who has been with us for about seven years. He's our junior varsity basketball coach and one of the assistant football coaches. Coach Burkette has done a good job with both programs." As Washington exited my room, he stated, "Coach, you will be a part of the athletic

-2-

RECEIVED
EEOC

JAN - 5 2007

program." Washington then gave me a thumbs up signal with a smile and walked off.

On May 25, 2006, I made another request to transfer from Lanier only if Coach Moncrief would acquire the health position. Washington stated, "Coach, I'm sure Moncrief would appreciate your concern, but, you should leave that situation alone." I asked Principal Washington, "Has L.C. Cole gotten these positions?" Principal Washington then stated, "why do you think that L.C. has anything to do with this?" I stated, "Now, Mr. Washington, I noticed L.C. Cole last Friday evening walking Lanier's track with the gym's custodian (Fred Scott)." I also informed Principal Washington that he (L.C.) has held several conferences with Principal Washington on these dates or that L.C. Cole was seen on Lanier's campus during the late evenings after all coaching activities had concluded for the day."

On May 29, 2006, I was informed by a "coach" that L.C. Cole had offered him a position on his staff at Lanier. It was also told to me that L.C. Cole had already contacted Tavarious Jackson for a donation to Lanier's Athletic. For his donation, L.C. Cole would have Lanier's weight room named after him.

On May 30, 2006, I observed L.C. Cole measuring the gym's weight room area with a tape measure, legal pad and pencil.

On May 31, 2006, I observed L.C. Cole and Fred Scott (custodian) discussing what areas of the gym and weight room needed to be cleaned.

On June 1, 2006, I observed L.C. Cole and the Fred Scott (custodian) engaged in a conversation. They both held sweeping brooms and dust pans in their possession.

On June 2, 2006, I observed Fred Scott opening the gym doors and allowed L.C. Cole to tour the facility with a legal pad in his possession. I walked into the gym doors and observed L.C. Cole

RECEIVED
EEOC

JAN - 5 2007

BIRMINGHAM DISTRICT OFFICE

-3-

engaged in a conversation on the office phone.

On June 5, 2006, Principal Washington agreed to allow me to continue hosting my basketball camp at Lanier's gym. This also concluded my 10-month contract.

On June 6, 2006, Coach Matthews informed me that summer basketball practice would start on June 7, 2006 and that we would alternate practice time. He also mentioned that we had a game scheduled with Montgomery Academy on the June 13, 2006.

On June 7, 2006, I began practicing the junior varsity and assisting the varsity with preparation for the upcoming basketball tournament.

On June 8, 2006, both basketball teams held controlled scrimmages from 2:00 p.m. until 4:30 p.m. I coached the junior varsity team against the varsity team.

On June 2006, Coach Moncrief ended his contract as A.D. Prior to him leaving as A.D., he had assured me before and after I received the non-renewal that I would be basketball and assistant football coach.

On June 8, 2006, I received a memo informing me that I had a scheduled interview on Saturday, June 10, 2006 at 8:30 a.m.

On June 10, 2006, I interviewed for the Athletic Director job.

On June 10, 2006, Washington told a Montgomery Advertiser employee that I had given a good interview and was currently the assistant football and basketball coach. Washington also publically classified me as a very good candidate.

On June 12, 2006, I practiced the junior varsity players from 2:30 p.m. until 5:00 p.m.

On June 13, 2006, I observed Washington and L.C. Cole standing in front of Lanier's building engaged in a conversation and occasionally giving each other what appeared to be a

RECEIVED
EEOC

JAN - 5 2007

"congratulatory handshake." L.C. Cole got into his vehicle and Washington got in his as well. Washington then appeared to follow him. However, Washington returned back to Lanier at approximately 2:28 p.m. I coached the junior varsity in a game against Montgomery Academy at 6:00 p.m.

On June 18, 2006, I began preparing the gymnasium for the basketball camp which was scheduled to start the next morning. I observed L.C. Cole once again on Lanier's campus conversing with Fred Scott (custodian).

On June 19, 2006, I observed L.C. Cole and Washington standing near the rear of Washington's office door exchanging what appeared to be "congratulatory handshakes". I received a memo informing me that I have a post interview with Principal Washington on June 20, 2006 at 5:00 p.m. I assisted the varsity basketball in a game against Montgomery Academy High School.

On June 20, 2006, I met with Principal Washington and Assistant Principals Jerome Torbert and Inez Everage. Washington informed me that I had not been selected for the A.D. position and that Washington didn't support me nor did any of the interviewing committee members. Washington also stated "Coach, the sky is the limit for what you can achieve. You have a solid educational background, you gave a good interview and you'll be graduating next month with that Ed.S. and you will be making all of the money. I know that this may be disappointing to you, but trust me, these positions will be opened back up sooner than you think." I was told by Washington that my 10-month contract would still stay in place.

On June 21, 2006, during my basketball camp, they announced "new coach" L.C. Cole, was touring the gym facilities with Coach Matthews. It is my understanding that L.C. Cole did not have a teaching certificate at that time. Coach Matthews stopped in the gym and formally introduced me

RECEIVED
EEOC

JAN - 5 2007

to L.C. Cole. Matthews stated "This is Coach David Burkette. He handles the J.V. team as well as assists me with the varsity basketball." As L.C. Cole and I acknowledged each other, Coach Matthews called my son over to meet L.C. Cole also. After introducing my son, Coach Matthews described my son's performance in the jamboree football game in Troy. L.C. Cole smiled and exchanged handshakes with my son before walking off. I fully welcomed L.C. Cole and vowed to be of any assistance if he should ever need me.

On June 22, 2006, I coached the junior varsity team in a scheduled basketball scrimmage against the varsity players.

On June 23 & 24, 2006, I practiced the junior varsity basketball from 2:00 p.m. until 4:00 p.m.

On June 27, 28, & 29, 2006, I assisted L.C. Cole with building lockers for the locker room.

On June 30, 2006, I coached the junior varsity basketball team and assisted the varsity in three games at Carver and St. Jude.

On July 1, 2006, Washington and Jerome Torbert entered the locker room, looked around and saw me assisting L.C. Cole with building the wooden football lockers. Immediately, Principal Washington asked L.C. Cole to come and go with him for a minute and that Principal Washington needed to get a number from him. After Principal Washington, Torbert and Cole walked out of the locker room, only Coach Cole returned. After about two to three minutes, L.C. Cole told me that "Coach, I think that I can handle this from here but I thank you for your help anyway."

On July 1, 2006, L.C. Cole questioned several football players about what kind of guy I was and what positions I coached. Also, did they like me and how close was I with Coach Moncrief.

On July 7, 2006, L.C. Cole held a meeting with all coaches. During this meeting, I

RECEIVED
EXH:
JAN − 5 2007

introduced myself as the J.V. coach. I signed in as the junior varsity basketball coach, was told that I would be sharing the basketball office with the baseball coaches, was asked to provide L.C. Cole with a junior varsity basketball roster and was told like all of the other coaches, "I'll talk to each one of you individually and discuss fundraising and to get a personal feel about the knowledge you have for your sport." It is also to be noted that I was the <u>only</u> basketball coach present at this meeting.

On July 11, 2006, L.C. Cole held a one-on-one meeting with me using what I deemed as "very interesting", the identical questionnaire Washington used during the interviewing process on June 17, 2006. He also referred to an answer sheet each time he asked a question. His first question was "what type of relationship did the former coach and you have and what way would he describe you?" After I answered, L.C. Cole went on to say that "I already have my football staff and besides I understand that you're not really a football coach either." I asked "Where did you get that from?" L.C. Cole stated "Well, that doesn't matter, but tell me why should I hire you back as a basketball coach?" I stated my credentials, background and provided him with a copy of my resume and certification certificate along with expressing my love for Lanier's students/athletes. L.C. Cole then stated, "Well, I'm not going to need you for basketball either and don't take this personal because I don't even know you." His son looked on, who by the way, was present the entire meeting time. L.C. Cole further stated, "You and Coach Matthews are the only basketball coaches that I know about around here. So, I just think that Lanier's basketball program needs to go in another direction." Upon hearing this statement, I immediately questioned this decision. I stated, "Coach Cole, I have always supported you long before this meeting here. My son had attended two of your football camps, and I have conversed with you three to four times prior to this meeting. However, with a 204-67 basketball coaching record including posting a 81-32 coaching record here at Lanier,

RECEIVED
EEOC

JAN - 5 2007

I posted a 34-7 record the past two seasons. I have won or assisted in 5 state championships over my 22 year basketball career. Why does my program need to go into another direction?" L.C. Cole responded by stating "Well . . . just let me think about it a little more and I'll get back with you." I then stated, "so this is not a final decision?" L.C. Cole stated "No, just let me sleep on this and I'll get back with you with an answer on tomorrow." I said "Coach, it's only 10:20, are you sure that tomorrow's not too long?" L.C. stated, "Coach, meet me back up here at 9:00 in the morning." It is to be noted that 9:00 on tomorrow morning never came. However, I did observe Washington and L.C. Cole talking in Washington's office at 1:38 p.m. this same day even though Cole said he wanted the basketball program going in a new direction he retained the Head Basketball Coach.

On July 13, 2006, I received a telephone call from Jeremy Hall's mom and dad indicating that my son was currently involved in a violent argument with another football player. When my wife and I arrived there was no evidence of supervision.

On July 14, 2006, my son was sent out of the weight room by L.C. Cole for not having blue and white clothes on and for looking in the mirror.

On July 14, 2006, I sought advice and assistance of MCEA.

On July 17, 2006, Washington told me to move out of room 211 to room 227. I did.

On July 19, 2006, my son was told by L.C. Cole that if he wanted to a part of his program he would have to cut his hair. Within the same breath, he would not allow my son to participate in weightlifting and told him to get off this campus and go home.

On July 29, 2006, my son was injured and did not participate in a controlled scrimmage. Although not in uniform, my son had informed Cole that his mother would call him for personal reasons. When she called, he answered and Cole immediately yelled at him swinging his arms in

RECEIVED
EEOC

JAN - 5 2007

DISTRICT 15 DISTRICT OFFICE

-8-

motion, "just get off my field son!". When my son explained to Cole that he was talking to his mother, Cole stated, "I don't give a damn just get off my field." It is to be noted that this action took place during "half-time" of this controlled scrimmage and nearly the entire team was on a water break.

On July 31, 2006, Washington told me that I would be the only Driver Ed teacher and for me to move to Room 133. I did.

On August 4, 2006 at 1:40 p.m., Washington told me not to report back to work as a 10-month employee and for me to just wait until the 9-month teachers return to work on next Wednesday. During this same evening at 7:07 p.m., Washington called me at home and informed me that he had talked to Mr. Barker and Washington convinced him that I should remain on my 10-month contract.

On August 9, 2006, Washington made repeated all calls for me to pick up my teacher's bag from the Eubank Center. When I arrived, there were three other bags left with names on them. However, no one else's name was called.

On August 10, 2006, Washington repeated all calls for me to report to the main office immediately. Once I arrived, Washington asked me had I moved out of Room 133. He then stated that the simulators would be moved to Room 340.

On August 10, 2006, I complained about the over crowding in all of my classes. I informed Dan Aude about this situation to see if there was anything the State Department could do. He conversed with Washington on 8-11-06 regarding this issue. Since that conversation, my classes increased in numbers and my classes remain over the required number of students per class (15).

On August 11, 2006, Washington told me to move from Room 133 to Room 340. I did.

RECEIVED
EEOC

JAN - 5 2007

-9-

On August 11, 2006, Washington assigned another teacher to move from Room 0004 (gym) to Room 336 to keep a watch on me. This teacher told Washington that the teacher wanted no part of his scheme this time.

On August 22, 2006, a teacher and coach hired by Principal Washington was terminated because of an unfavorable criminal background. The employee had the assignment of assistant football and head junior varsity basketball coach.

On August 26, 2006, this "terminated" coach coached in a football contest at Wilcox Central after being removed from the classroom on 8/23/06.

On August 31, 2006, Washington sent his secretary to Room 227 to watch my class while he held a conference with me. Once I arrived to Principal Washington's office at 9:07 a.m., he had Coach Matthews present. Washington said I had accused him of changing a student's grade. The previous day I did talk to a teacher who stated, "she had gotten tired of Washington sending this student's parents to her room, tired of talking to Mr. Torbert about helping this student out, tired of talking to Coach Matthews about this situation and finally, after Washington stopped her on Friday, August 25, 2006 after school, Washington convinced her that this issue would never come up again and to give this student another chance. Yes, I did tell this teacher to be careful because this student had literally bragged to nearly every other football player who also had failed summer school." This teacher appeared to be "intimidated" by him because of her non-tenured status. This student also told the school's police officer about this situation at 9:03 a.m.

On September 1, 2006, Washington supported Coach Cole's decision regarding my son. My son received a two game suspension from football and the head football coach cited two reasons (Reason #1) my son's first game suspension was a result of him not removing his helmet in a timely

RECEIVED
EEOC

JAN - 5 2007

BIRMINGHAM DISTRICT OFFICE

fashion after a football contest in Niceville, Florida.

It is to be noted that my wife and I both had informed Washington and L.C. Cole about our observation of several other players with their helmets on. Both of them said that if we could prove this, then Washington would consider lifting his suspension. Their jersey numbers were: 22, 88, 5 and 79, and I provided this information to Washington but the suspension was not changed. These players were not suspended or reprimanded as my son was. (Reason #2) my son's second suspension was a result of him being involved in an "argument" with another football player. In reference to my son's argument with the other football player, that player was not suspended and L.C. Cole did not converse with this player over arguing with my son. Instead, this same player bragged when he got into the locker room with other players about the way he had "punked" my son out. Another player punched the same player that my son was involved in the argument. As several coaches looked on, the aggressor player stated, "Come on man! Fight me if you're bad! This ain't Rashard (my son). That man didn't say nothing to you and all y'all want to do is pick on that man." L.C. Cole knew of this allegation and did not punish either student.

On September 2, 2006, the football team arrived to Lanier at 11:37 a.m. My son called for us to pick him up from Lanier at 11:39 a.m. At 12:04 p.m., my wife and I arrived at Lanier to hopefully talk with the head football coach to find out why our son was the only child the head football coach lashed out at, embarrassed, and punished with back to back suspensions. Washington was informed that when we arrived at Lanier, there was no evidence of supervision. When we arrived to discuss this matter, there wasn't a single coach on Lanier's campus including the head football coach. But, who we did see was the player whom my son was arguing with and several other players with him standing in the doorways apparently awaiting for my son to come out. We

RECEIVED
EEOC

JAN - 5 2007

-11-

got out of my car and started walking towards the locker room doors. During this time, my wife and I overheard one of the players say, "Be cool man, there's that N_____'s daddy." The players walked away as my son exited the locker room. We became very concerned over the lack of supervision and for the safety of our son.

On September 2, 2006, no supervision after my son had been threatened by another student after the team arrived on Lanier's campus.

On September 2, 2006, two football players were witnessed climbing out of the locker room by the Montgomery Police Department Officers. The officers reported this incident to the Athletic Director and head football coach. These players were told by the Athletic Director that they will run extra before and after practice as their punishment. On September 4, 2006 Washington held a meeting with all coaches and discussed my son openly. Several coaches were alleged to have something negative to report to him. While my wife and me began to listen to some of the problems Washington said these coaches had reported, the most serious allegation was, "He was sent out of the gym repeatedly by Coach Matthews and was ultimately late going to weightlifting." My son told Washington that the reason why he didn't leave the gym the first time was because "Coach Keith had told other players that I can't play for him. I had been joked on everyday about my daddy not being the coach no more. I tried to talk to Coach Keith, but he told me to get out of the gym and to go lift weights." Interestingly, at this point, the Athletic Director vehemently denied ever naming a junior varsity basketball coach. (9-5-06)

On September 4, 2006, my wife scheduled a conference with the head football coach and athletic director for September 5, 2006 at 7:30 a.m.

On September 4, 2006, Washington held a pre-conference with the coaching staff, and all of

RECEIVED
EEOC

JAN - 5 2007

the football coaches, including the head football coach gathering as much negative information as possible and discussed my son.

In an attempt to help find answers to avoid problems that exist at Lanier High School, we held a September 5, 2006 conference with Washington and the head football coach. During our session, there was obvious evidence that Washington's previous conference with the football coaching staff aided in his willing not to be fair. However, it was quite interesting to hear Washington state to my son: "I have personally watched you perform and see that you are the best quarterback out there, in my opinion and I have talked with Coach. We both agreed that it's not going to take no time before you get that starting position. You grew up in an athletic family and your daddy is a very good coach. I see you sporting your daddy's championship rings from basketball and you're just that good too. Just win you one as a player and show your daddy that you too, can win championships." (Laughing).

My son believed in Washington and made a commitment to step it up even more when he had sworn to him that he was by far the better quarterback at Lanier. Also, during this conference, my wife and I were offended and surprised to learn that Washington was secretly video taping us. My son later stated that he was embarrassed and scared that the head football coach would use this video tape to further humiliate him in front of the football team. L.C. Cole called my son "selfish" on nearly a daily basis. He (my son) constantly asks, "Why did Mr. Washington put me in the middle of this? I didn't do nothing to nobody or nothing! Why aren't they handling y'all situation with you instead of picking on me? I'm tired of being treated like a dog everyday! When one coach tells me to do something, then another coach would come over and make me do the opposite. When I fell into an ants bed, I took off my shoulder pads and started shaking the ants off. Coach Payne told

RECEIVED
EEOC

JAN - 5 2007

me to put my pads back on or get off of the field. After practice Coach Cole made me roll down the whole football field while everybody watched and laughed."

It was necessary for my son to be placed in a safer environment that is conducive to learning. Under Washington's tutelage as a principal and under the tutelage of the Athletic Director, my child would no longer be subjected to a pattern of taunting, resentment, double standards, harassing, and being made an example of a "marked child."

On September 5, 2006, a football player refused to participate in an extra running drill ordered by the head coach. I observed this player cursed by the head coach, walked off the football field, then yelled "This ain't Rashard (my son) that you're (profanity) with because I don't give a (profanity) about quitting." This player was allowed to return to practice on September 7, 2006 and started in the game on September 8, 2006.

On September 11, 2006, while my son was participating in a quarterback drill with an assistant coach, another assistant coach walked over to the head football coach and returned yelling at my son, "Burkette! get your (profanity) out of there! You're suspended and we don't need you no way. Take your (profanity) to the sideline or go home!" After this assistant's tirade, an argument ensued between the two assistant coaches. I walked over to the sideline to comfort my son as tears began streaming down his face, I became emotional as well and watched my son sit out the remaining practice. Although my son was not allowed to participate in practice, he was, however, told that he had to participate in the running drills if he wanted to be a part of this team.

On September 12, 2006, a football player cursed an assistant coach and repeatedly stated "you ain't no coach for real! You don't know (profanity) you think that you're going to talk to me like you're my daddy of somebody, man you're crazy as (profanity)! You keep (profanity) with me

RECEIVED
EEOC

JAN - 5 2007

-14-

like you (profanity) with Rashard (my son) and see what happens." Obviously embarrassed, this assistant coach stared at this player and started to continue the drills he had started. This player was not punished as me and several others adults watched in amazement.

On September 12, 2006, Washington hired an assistant coach to replace the dismissed coach (8/26/06). However, this newly hired coach was the same coach who was dismissed by formal athletic director, Richard Moncrief for abusing a football player. (August 2005).

On September 15, 2006, I observed four players with their helmets on while Lanier's band played the school's song. No action was taken as the head coach stood in the back of the football team. I know other adults observed this occur.

On September 18, 2006, three football players were suspected to be in possession of marijuana in the schools parking lot by the head football coach. Later this same evening, the head football coach gathered his entire team and coaches in the middle of the practice field. The head football coach called these three players out by name and stated to every person on the field "I have a serious problem with these guys." "They were caught smoking pot in the parking lot and I ain't going to put up with this kind of crap!" "I can tell you guys this, all three of y'all will run before and after practice today and will not play in the first half of the Lee game on Friday!" During this time, several adults and myself, observed one of the players challenge the head coach's decision and yelled to the coach "I ain't running for nobody! I ain't thinking about that (profanity) you're talking about." As this player proceeded walking across the practice field, he started taking off his gear and repeatedly stated "I quit any (profanity) way!. On September 21, 2006, this player returned to practice with the team and started in the September 22, 2006 game along with one of the other punished players.

RECEIVED
EEOC

JAN - 5 2007

BIRMINGHAM DISTRICT OFFICE

-15-

On September 18, 2006, before testing, Washington repeatedly all called my name to come to the main office immediately!  Washington knew I wasn't at work.

On September 19, 2006, Washington repeated his all call once again knowing that I was out on leave.

On September 20, 2006, Washington repeated his all call again.  On the evening of 9/20/06, Washington questioned my substitute in my room as to how she knew when to take the substitute's job.

On September 21, 2006, interestingly, Washington made yet another all call for me to come to the main office.  He knew that I wasn't at work.

On September 22, 2006, I reported to the assigned room in which I was to proctor.  However, I was told that I wasn't needed.  Washington sent his secretary to room 340 to keep my class while I attend a conference with Washington in his office.  Present in this conference was assistant principal, Inez Everage.  Washington first accused me of not calling in my substitute on two occasions.  Then he started reading off a computerized sheet of paper that he claimed did not show an identification number for Wednesday 9/20/06.  I informed him that the substitute I had chosen was present each day that I was out and that there was never an issue.  He stated that I would have to bring him a doctor's excuse and proof to show that I have identification numbers and dates.  Up until this point, I was in disbelief over his investigation into my absence from work and my professional reputation.  Also, he warned me to contact the testing facilitator the next time that I plan to be out from work.  His actions taken regarding this issue are arbitrary and capricious and are not in compliance with set standards with board policies.  His assertions are just conclusory assertions and are not based on facts.

RECEIVED

JAN - 5 2007

RIDLEY

-16-

On September 22, 2006, Washington mentioned that he needed me to provide him with a list of student drivers who have paid their $30 fees. He then asked me "how many have paid their fees already?" I then stated around 73 or 74. He suggested that I cut off at that number. I asked for clarity purposes, what about the students who haven't paid their fees? He stated "they should receive no credit if they have missed the deadline for fees to be paid. He also suggested that I provide him with a master copy of scheduled drivers and not to drive any students until he approved me to do so. At this time, I realized that he was investigating and auditing my receipt books, students name, and the amount of money having been turned in. Also on this date, I was relieved of my teaching duty to have a conference with Mr. Torbert. I had informed Washington about the concern that I had with Mr. Torbert fulfilling his "given" assignment of keeping tabs on me for quite some time. He allowed me to read a complaint letter of suspicious nature against me and tried to demand that I sign a second sheet baring only a print version of his name and my name at the bottom of the paper. This leaving a blank body with room enough for him to go back and type whatever he wanted to type in with my signature already signed at the bottom of the page. Nevertheless, during the time he claimed that my students were unsupervised, I had two teachers watching my class as I attended to a disciplinary problem with a student, and had monies receipted.

On September 25, 2006, I hand delivered Washington a letter indicating that I had completed all instructional requirements to begin driving by Wednesday (27th).

On September 25, 2006, Washington called a student out of his first period class and questioned him extensively about why he didn't receive a receipt for paying his driver's ed fees and receiving his $10 change. Washington then called Lanier's bookkeeper into this conference along with Mr. Torbert. Washington suggested that the bookkeeper bring with her my receipt book.

RECEIVED
EEOC

JAN - 5 2007

Washington forced this student to write him a statement indicating I had taken his money. This student returned to his third period class. At 1:52 p.m., I have this student in my 6th period class. Washington sent his secretary to my class (Room 340) informing me that I needed to come to his office immediately. Once I arrived at his office, he told me that this student's parent had called him and was very upset over her son not having a receipt. I assured Washington that this student had not paid his fees because I recalled him and another student playing with two twenty dollar bills and once I received that money I receipted the student who had given me the money. The other student never confirmed that this should have been his receipt. However, I talked with this student's mother and corrected this unfortunate incident. In this student's statement to Washington, he indicated to his mother and me that he was playing and didn't think nothing of it.

On September 25, 2006, a football player cursed the head coach and told him that he quit the team. This player was allowed to rejoin the team on September 27, 2006.

On September 25, 2006, I informed Washington that I had completed all necessary requirements to begin driving.

On September 26, 2006, Washington "all called" me to his office to tell me that Room 227 is available and for me to move in.

On September 27, 2006, Washington "all called" me to come to his office. Once I arrived, he handed me a memo indicating that I'll have to provide him with several documents before I began driving.

On September 28, 2006, I hand delivered a letter of clarity to Washington in reference to all student driver's grades.

On September 28, 2006, Washington sent his secretary up to my room (340) to hand deliver

-18-

RECEIVED
EEOC

JAN - 5 2007

me a response letter. However, in my findings, his letter contradicted our conference on 9/25/06. In this interesting letter, he never denied the fact that he had suggested for the non-paid students to receive "no-credit."

On September 29, 2006, a football player was caught having sex by the custodian on the 3rd floor restroom floor. Washington met with his (student) mother and father and told them "had your son told me the truth in the first place, I would have given him only a one day suspension." Washington went on to tell the student that he saw him on the surveillance camera and asked the student did he use a condom. The athletic director posted this student's office referral on the athletic board causing great embarrassment to him. Washington suspended him for 3 days and the athletic director never suspended this student but told him that it would be a game time decision if he'll play on the next Friday. He sat out one game.

On October 2, 2006, Washington walked in my room (340) at 12:23, looked around for a few seconds and left.

The treatment of my son versus other athletes shows there existed a double standard for him. Washington, Jerome Torbert, L.C. Cole and Craig Payne have been influential in attempting to destroy my son's credibility as a student and athlete. There have been no evidence of contrition or remorse from any of them while the treatment that my son endured was unfair, extra-ordinary and despicable. Predictably, Washington continued attacking my family with relentless attempts to stop my son's transfer to Carver Senior High School.

On October 9, 2006, Lead Counselor at Lanier, Ms. Rose Penn, informed Washington that a withdrawal form had been requested on behalf of my son. Washington directed her to employ some type of demanding practice: that my wife show him proof of my son's residence and proof of

RECEIVED
EEOC

utilities at the new address before he would sign any withdrawal form. My wife walked over to his office to bring this to his attention. Washington repeated what Ms. Penn had told her moments earlier and suggested an additional requirement. A letter from student support, seemingly, that he intentionally used a stalling tactic. Washington called the principal of Carver High School and gave him a warning not to allow this transfer to happen thus, asserting that I was angry over my son's lack of playing time. On this same date, he conversed with an Alabama High School Athletic Association employee in reference to stop my son's athletic eligibility.

On October 9, 2006, Washington audited and investigated my records.

On October 10, 2006, my wife returned to Lanier to complete the transfer. Washington had already informed the entire counselor's office that if my wife shows up, for her to deal with Principal Washington and for them not to allow her to complete my son's transfer. Once my wife entered his office, he continued to deny signing the transfer form and boldly suggested that she allow my son to remain at Lanier. He stated "he needed to take his "nine weeks exam." Washington suggested to her once more that Monday would be better for him to transfer. My wife informed Principal Washington that she had spoken with Mrs. Lois Johnson, of Student Support, in reference to Washington's attempts to stop this transfer. She assured her that our rights were violated and that my wife should not have been subjected to such demand. Washington told my wife that "Mrs. Johnson didn't know what she was talking about." Even after my wife attempted to show him proof of address and proof of utilities present at my new address, Washington continued to request that she show him a letter of permission from student support. She did not feel that our personal life was any concern of Washington's and questioned Washington about the criteria or policy to transfer from Lanier High School. Later this same evening, my wife talked with Mrs. Linda Robinson , Mrs. Lois

RECEIVED
EDIC

JAN - 5 2007

# Exhibit "6"

## Dismissal and
## Notice of Rights

EEOC Form 161 (3/98)    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: David Burkette<br>3300 Cross Creek Drive<br>Montgomery, AL 36116 | From: Birmingham District Office<br>Ridge Park Place<br>1130 22nd Street, South<br>Birmingham, AL 35205 |
|---|---|

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2007-01352 | Julia Y. Hodge,<br>Investigator | (205) 212-2147 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*[signature]*                                                      2 4 SEP 2007

Enclosure(s)

Delner Franklin-Thomas,
District Director                                          *(Date Mailed)*

cc: William F. Patty, Charging Party's Attorney
2101 6th Avenue North, Suite 1125 - Colonial Plaza
Birmingham, AL 35203

Jayne Harrell Williams, Respondent's Attorney
Hill, Hill, Carter
425 South Perry Street
Montgomery, AL 36104